```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION

 3   UNITED STATES OF AMERICA          )
                                       )
 4                 Plaintiff,          )    CRIMINAL ACTION FILE
                                       )    NO. 1:13-CR-111-RWS
 5   v.                                )
                                       )    ATLANTA, GEORGIA
 6   YASMEEN SHAKIRA WILLIAMS          )
                                       )
 7                 Defendant.          )
     _____)
 8

 9           TRANSCRIPT OF AUDIO-RECORDED PROCEEDINGS
                BEFORE THE HONORABLE JANET F. KING,
10                UNITED STATES MAGISTRATE JUDGE

11                   Tuesday, August 6, 2013

12

13

14
     APPEARANCES OF COUNSEL:
15
     For the Plaintiff:            OFFICE OF THE U.S. ATTORNEY
16                                 (By:  Mary Christine Roemer)

17   For the Defendant:           FEDERAL DEFENDER PROGRAM INC.
                                   (By:  Thomas L. Hawker)
18

19

20

21      Proceedings digitally audio-recorded, then transcribed by
                mechanical stenography and computer by
22               NICHOLAS A. MARRONE, RMR, CRR
                     1714 U. S. Courthouse
23                  75 Spring Street, S.W.
                     Atlanta, GA  30303
24                     (404) 215-1486

25
```

```
1                         I N D E X

2    Witness                                    Page

3    MEAGAN HORTON
          Direct (By Ms. Roemer)               3
4         Cross (By Mr. Hawker)                22
          Redirect (By Ms. Roemer)            37
5         Recross (By Mr. Hawker)             38

6    DAPHNE LYNN HAYES
          Direct (By Mr. Hawker)              39
7         Cross (By Ms. Roemer)               52
          Redirect (By Mr. Hawker)            53
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    Tuesday Morning Session

 2                       August 6, 2013

 3                         10:11 a.m.

 4                        -- -- --

 5               P R O C E E D I N G S

 6                        -- -- --

 7                    (In open court:)

 8          THE COURT:  (Recording begins.) Mr. Hawker is here

 9    for the defendant.

10          The defendant requested a preliminary hearing and

11    asked for bond.  We will take up the preliminary hearing part

12    of this first.

13          Ms. Roemer?

14          MS. ROEMER:  Thank you, Your Honor.  I call

15    Meagan Horton to the stand.

16          (The oath is given by the Courtroom Deputy Clerk.)

17          THE CLERK:  You may be seated.

18                        -- -- --

19                      MEAGAN HORTON

20     being first duly sworn by the Courtroom Deputy Clerk,

21                 testifies and says as follows:

22                        -- -- --

23                    DIRECT EXAMINATION

24    BY MS. ROEMER:

25    Q.   Ms. Horton, how are you employed?
```

1    A.    I'm a U.S. probation officer.

2    Q.    How long have you been a United States probation

3    officer?

4    A.    Three years.

5    Q.    And what are your duties as a U.S. probation officer?

6    A.    I have a case load of postconviction cases and pretrial

7    cases, and I supervise those clients.

8    Q.    And is one of the individuals whom you supervise

9    Yasmeen Shakira Williams?

10   A.    Yes, it is.

11   Q.    How long have you supervised Ms. Williams?

12   A.    Since March 4th, 2013.

13   Q.    Who supervised -- or was there someone that supervised

14   Ms. Williams before you got her case?

15   A.    There was.  U.S. Probation Officer Donna High.

16   Q.    And how long did Ms. High supervise Ms. Williams?

17   A.    Since her -- since the start of her supervised release

18   period with the exception of the period she was on location

19   monitoring, at which time another officer, U.S. Probation

20   Officer Joe Best.

21   Q.    So two other previous --

22   A.    Uh-huh.

23   Q.    Two other probation officers?

24   A.    Yes.

25   Q.    All right.  And you said since the time she began on

1    supervision, so let me refer to your violation report which

2    was filed in the Clerk's office on July 24th.

3         That indicates that the date supervision commenced was

4    May 31st, 2011?

5    A.   That's correct.

6    Q.   And it also indicates that Ms. Williams is on a

7    five-year period of supervised release?

8    A.   That's correct.

9    Q.   After serving a time-served sentence?

10   A.   Yes.

11   Q.   All right.  Now, the violation report that you filed or

12   that was filed on July 24th indicates that there were a

13   number of alleged violations of Ms. Williams'

14   supervision.  Let's go through those one by one.

15        The first violation indicates violation of Condition

16   No. 2, failure to report to you as directed.  Could you

17   inform the Court, please, what the facts are around that

18   violation?

19   A.   Yes.  A letter was sent to Ms. Williams indicating that

20   she needed to report for an administrative hearing on July

21   1st, 2013.  She failed to report for that, that hearing.

22   Q.   Do you know if she got the letter?

23   A.   No.  It was sent to her at the residence that we had

24   for her, and also I left two voice mails for her on her

25   phone.

1   Q.    Okay.  Do you know if her voice -- if her phone number

2   has changed?

3   A.    Since, she indicated recently this month that her phone

4   number had changed.

5        And actually that morning after the hearing, I attempted

6   to call her again and left her a voice mail, and she called

7   me back.

8        And I asked her why she hadn't been here, and she said

9   she was out at an employment interview.  I told her to be

10  there by 2:00 that day, because this was earlier in the day,

11  and she failed to come in that day.  And I didn't receive any

12  further phone calls from her.

13  Q.    So you spoke to her the morning that she was to report?

14  A.    That's correct.

15  Q.    Okay.  Now, in a moment I'm going to ask you what the

16  reason was for the administrative hearing that you had

17  scheduled that afternoon, but let's look at the second

18  violation you allege of Condition No. 3, failure to follow

19  your instructions.

20       What's the basis for that allegation?

21  A.    On January 3rd, 2013, Ms. Williams was instructed at an

22  previous administrative hearing to take care of -- turn

23  herself in on a warrant that was outstanding out of Rockdale

24  County.

25  Q.    And what was that warrant for in Rockdale?

1   A.   It was for an outstanding warrant for a traffic

2   violation, a failure to appear.

3   Q.   And you indicate that the supervising officer directed

4   that Ms. Williams turn herself in within thirty days?

5   A.   Yes.

6   Q.   How did you or the probation office learn of the

7   Rockdale County warrant?

8   A.   By running periodic criminal history checks.

9   Q.   Okay.  To your knowledge, has Ms. Williams addressed

10  that outstanding warrant?

11  A.   No.  I ran her criminal history yesterday, and the

12  warrant is still outstanding.

13  Q.   Okay.  Now, you indicate in that same violation of

14  Condition No. 3 that Ms. Williams has not paid an outstanding

15  balance of location monitoring fees, and that at the time of

16  the petition at least she owed $597.84; is that correct?

17  A.   That's correct.

18  Q.   Why was she on location monitoring?

19  A.   In a previous violation report submitted to the Court,

20  it was recommended that her conditions be modified for her to

21  serve a period on location monitoring.

22  Q.   How long was that period to be?

23  A.   180 days.

24  Q.   And what -- did she complete the 180 days?

25  A.   Yes, she did.

1    Q.    All right.   And so the outstanding balance of the $597

2    and some change, that number would not go up -- would not

3    have gone up, would it?

4    A.    No.   It's from that period.

5    Q.    Okay.

6    A.    It has not gone up.

7    Q.    And so that same amount is still pending today?

8    A.    That's correct.

9    Q.    Okay.   So since you filed the petition, she's not made

10   any payments?

11   A.    No.

12   Q.    Okay.   You indicate in Paragraph 3 a violation of

13   Condition No. 5, failure to work, and a period of

14   unemployment since January 7th of 2012.   Would you let the

15   Court know, please, what you can about Ms. Williams' efforts

16   to find employment?

17   A.    She hasn't provided any information to me about seeking

18   employment, even though she's been told several times she

19   needed to obtain employment.

20   Q.    Okay.   Now, this says since January 7th, 2012.   That's

21   well before you got her case?

22   A.    Yes.

23   Q.    How is it that you are familiar with what her -- what

24   she has done to inform the probation office from then until

25   the time you got the case?

1   A.   I cannot speak for previous to when I was assigned to

2   the case, but there is nothing in the notes, the previous

3   probation officer's notes, and there is no employment

4   recorded in the computer.  And she hasn't reported any

5   employment or employment possibilities since I have had the

6   case.

7   Q.   So what are her obligations with respect to finding

8   employment?

9   A.   That she just needs to find employment.  We haven't

10   given her any other instructions.

11   Q.   Okay.  Now, supervision, let's go into that just a tiny

12   bit more.

13       Supervision began May 31st, 2011.  The petition says

14   unemployed since January 7th.  Did she have any employment

15   between those dates, May 2011 to January 2012?

16   A.   She did have a period of employment.  I do not know the

17   exact dates or the exact information about it.

18   Q.   Okay.  But you have reviewed Ms. High's notes?

19   A.   I have.

20   Q.   Okay.  So that -- the chronos?

21   A.   Uh-huh.

22   Q.   And from the chronos that you have reviewed, they don't

23   provide any information about Ms. Williams searching for

24   employment?  Is that what you are --

25   A.   Not to my knowledge.

1    Q.   Okay.  But -- not to your review.  You have done that

2    review; correct?

3    A.   Yes.

4    Q.   Okay.  And as far as you know today, Ms. Williams is

5    not -- is unemployed?

6    A.   As far as I know.

7    Q.   Okay.  Would an individual on supervised release be

8    obligated to report employment efforts to the supervising

9    probation officer?

10   A.   Yes, if they were instructed to do so.  But she is

11   required to report new employment.

12   Q.   Okay.  So you don't know if she was instructed to tell

13   Ms. High what she had been doing to find a job?

14   A.   I'm not sure.

15   Q.   Okay.  What about Paragraph 4 on the next page,

16   violation of Condition No. 7, failure to refrain from

17   unlawful use of a controlled substance?  What's the factual

18   basis for that allegation?

19   A.   The first positive listed, February 13th, 2013, she

20   submitted a urine screen which was positive for marijuana,

21   and it was confirmed by a lab.

22        And the second, March 13, 2013, Williams submitted a

23   urine screen that was positive for marijuana, which was also

24   confirmed by the lab.

25   Q.   And then the report indicates a third positive urine

1  screen?

2  A.   Uh-huh.  April 23rd, 2013, Ms. Williams submitted a

3  urine screen that was positive for methamphetamine, which was

4  also confirmed by the lab.

5  Q.   Had Ms. Williams had urine screens before that positive

6  on February 13, 2013?

7  A.   She has.

8  Q.   All right.  And what was -- had she been instructed to

9  provide urine screens -- or what were her instructions or

10  what was her -- what were her obligations?

11  A.   She was on our Code-a-Phone system, random testing

12  system, where she calls a number every day to find out if

13  she's to report for a urine screen.

14  Q.   And was she on that from the time her supervision began,

15  May 31st, 2011?

16  A.   I am not sure if she was actually on the Code-a-Phone

17  system.  I believe so, though.

18  Q.   Okay.  You are not positive?

19  A.   I can't say 100 percent.

20  Q.   Can you say if she had any urine screens that were

21  positive before February 13th, 2013?

22  A.   Yes.  She had a January 29th, 2013, marijuana positive

23  that was confirmed by the lab which was reported in a

24  previous violation report.

25  Q.   Okay.  Well, let's address that previous violation.

1    Your petition indicates that there were several violation

2    reports, three that had been reported to the Court before

3    this petition was filed; is that correct?

4    A.    Yeah, that's correct.

5    Q.    Okay.  And what was the first violation report that

6    your -- your summary indicates here it was September 2011?

7    A.    Yes.  That was submitted to the Middle District of

8    Georgia for the purposes of her missing random drug testing

9    on five occasions which was on the Code-a-Phone system,

10   failure to attend substance abuse counseling on seven

11   occasions, and the arrest for the driving on suspended

12   license.

13   Q.    And your report indicates that no action was recommended

14   to the Court be taken at that time; correct?

15   A.    That's correct.

16   Q.    Okay.  And those violations are not the subject of this

17   petition; correct?

18   A.    That's correct.

19   Q.    All right.  And the other thing, this is Middle District

20   of Georgia, so Ms. Williams had been convicted in the Middle

21   District of Georgia.  When was the case transferred here

22   formally?  When was jurisdiction transferred here, do you

23   know?

24   A.    Formally, on March 29th, 2013.

25   Q.    Okay.  So just very recently?

A.    Uh-huh.

Q.    Now, the second violation report you indicate also was
reported to the Middle District of Georgia in November of
2011, a couple months after the first one, for disorderly
conduct.

      Can you summarize just what that was about, that
violation report?

A.    Yes.  There was a new listing, an arrest for disorderly
conduct.  She failed to report for random drug testing on
three occasions and failed to attend counseling on three
occasions.

      And that's when we agreed to modify her conditions to
180 days on location monitoring.

Q.    Okay.  And about when did the location monitoring
begin?

A.    About November 24th, 2011, it was ordered, and she
completed it on -- she actually was set up on December the
10th, 2011, and completed on June 21st, 2012.

Q.    Okay.  Now, let's just briefly look at the third
violation report which you indicate was filed in February of
2013.  Would you summarize what that was about for the Court,
please?

A.    Yes.  That was also sent to the Middle District of
Georgia for failure to report for random drug testing on ten
occasions.

1    We did have an administrative hearing -- the previous

2    officer, Officer High had a previous administrative hearing

3    on January 3rd, 2013, where she was reprimanded for failing

4    to report for drug testing.

5        Subsequently, thereafter she failed to report for a

6    random drug test on January 14th, 2013, and a positive urine

7    screen was collected for marijuana on January 29th, 2013,

8    which was confirmed by the lab.

9        That was -- at the time, then it was decided that we

10   would request transfer of jurisdiction.

11   Q.   After the administrative hearing?

12   A.   Those two violations were after the administrative

13   hearing.

14   Q.   Okay.  And then what happened on her supervision after

15   you requested the transfer of jurisdiction?  You mentioned a

16   moral reconation therapy?

17   A.   Yes.  She was placed in moral reconation therapy, which

18   is called MRT.  And that's a program --

19   Q.   What is that?

20   A.   It's basically a cognitive skills program where you go

21   through steps and hopefully to learn better ways of thinking

22   and behavior.

23   Q.   Your report indicates that she did not finish that

24   program?

25   A.   She did eventually complete it.

1    She did have six absences during the class, and they

2    actually had terminated her from the class on May 9th, 2013,

3    for excessive absences.  But I talked to them and gave them

4    an -- excused one absence so she could complete the program,

5    which she did on May 9th.

6    Q.   Okay.  So the third violation report submitted to the

7    Middle District of Georgia, there is no further action that's

8    going to be taken on the things that were alleged in that

9    report; isn't that correct?

10   A.   No.  They transferred jurisdiction -- we requested

11   transfer of jurisdiction and that they take no other

12   action.

13   Q.   Okay.  Now, let's go up and finish the last violation

14   that actually you indicate -- it is called Paragraph 6.  It

15   should be numbered Paragraph 5, shouldn't it, on the top of

16   the page?

17   A.   Yes.

18   Q.   Okay.  Violation of a special condition, failure to

19   report for drug testing.  Can you inform the Court, please,

20   the basis for that?

21   A.   Yes.  That's the other Code-a-Phone system.  She is to

22   come in on random drug screens when indicated on the phone

23   system, and she failed to do so on those three dates:

24   February 12th, 2013, February 25th, 2013, and May 20th, 2013.

25   Q.   Okay.  Now, at the time you filed the petition, you were

1    asking for a warrant, which Judge Story did issue.

2    A.   Uh-huh.

3    Q.   Are you familiar with the circumstances of Ms. Williams'

4    arrest last week?

5    A.   I am.

6    Q.   And how is it that you are familiar with them?

7    A.   I have discussed the circumstances with Deputy U.S.

8    Marshal Carlos Cosby.

9    Q.   And was Carlos Cosby the deputy marshal that executed

10   the arrest warrant?

11   A.   He was.

12   Q.   Okay.  And what did Deputy Cosby tell you about the

13   arrest?

14   A.   At first he told me he found an apartment in

15   Ms. Williams' name leased to her since November 9th, 2012,

16   that I was unaware of.

17        And he attempted -- when he attempted to execute the

18   warrant on August 1st, the morning of August 1st, he had the

19   fugitive task force, Southeastern Regional Fugitive Task

20   Force, with him.

21        And when they attempted to execute the warrant, they

22   knocked on the door of this apartment.

23   Q.   Now, this is the apartment that he told you about that

24   you did not know about?

25   A.   That's correct, I did not know about it, uh-huh.

1    Q.    Okay.  Let pursue that for one second.

2          What are Ms. Williams' obligations with respect to her

3    residence?

4    A.    She is to get permission before changing her residence,

5    and she did not do so.  Or if she does change her residence,

6    she needs to notify us immediately.

7    Q.    Okay.  And you hadn't heard anything about this --

8    A.    No.

9    Q.    Is it an apartment?

10   A.    It's an apartment.

11   Q.    Okay.  And you provided me with a copy of an apartment

12   lease?

13   A.    I did.

14   Q.    Okay.  And did you obtain that from Carlos Cosby?  Had

15   he gotten it?

16   A.    I did.

17   Q.    Okay.  And it indicated that the lease began November

18   9th, 2012?

19   A.    That's correct.

20   Q.    Okay.  Now, go ahead, if you would, please, with

21   describing what happened on the day of the arrest?

22   A.    He described that they knocked on the door several

23   times, announced their presence, and no one came to the

24   door.

25         After several minutes, he heard -- all of the officers

1    heard footsteps in the apartment and knew somebody was

2    there.

3        They breached the door, and immediately saw Ms. Williams

4    and another male in the hallway of the apartment, and

5    Ms. Williams was holding her baby.

6    Q.   And what -- but they had to breach the door?

7    A.   They did.

8    Q.   No one answered the door, okay.

9        Did they find anything else in the apartment?

10   A.   They did.  They immediately saw marijuana on the floor

11   of two rooms, I believe, and also in the toilets of the

12   master bedroom and the hall bathroom.

13   Q.   Did -- now, you provided me with a report that

14   Deputy Cosby filled out.  His report indicates that the

15   Fulton County sheriff's narcotics squad obtained a search

16   warrant for the apartment?

17   A.   They did.  And also when they first went in, they

18   observed two loaded semiautomatic handguns on the floor of

19   the master bedroom --

20   Q.   Okay.

21   A.   -- along with the marijuana that they saw.

22   Q.   Okay.

23   A.   And then they searched -- Fulton County narcotics was

24   able to obtain a search warrant.

25   Q.   And do you know what they found as a result of executing

1    the search warrant?

2    A.    I do.  They field tested the marijuana, which field

3    tested positive, and it was determined to be approximately

4    two and a half pounds of marijuana.  Also found $16,500 in

5    U.S. currency.

6    Q.    And --

7    A.    Other ammunition.

8    Q.    Okay.  So the two semiautomatic handguns?

9    A.    Yes.

10   Q.    Okay.  And they were loaded; correct?

11   A.    That's correct.

12   Q.    Did they run a criminal history check of the male that

13   was in the apartment with Ms. Williams?

14   A.    They did.  They identified him as Robert Lucas, and

15   found him to be a convicted felon who had current warrants

16   for drugs in DeKalb County.

17   Q.    Okay.  And why is that a concern with respect to someone

18   on supervision?

19   A.    Because part of Ms. Williams' conditions are that she

20   doesn't associate with convicted felons unless granted

21   permission by the probation officer.

22   Q.    Okay.  Had she requested permission to associate with

23   anyone with a felony?

24   A.    She had not.

25   Q.    Okay.  Do you know anything -- do you know from your

1    own -- from any discussion you might have had with

2    Ms. Williams what her relationship is to Mr. Lucas?

3    A.   No.  She has never brought him up to me.

4    Q.   Okay.  What actions were taken by Fulton County as a

5    result of what they found during the execution of the search

6    warrant?

7    A.   They have -- I have discussed this case with

8    Investigator Robinson with Fulton County Sheriff's

9    Office.  They have charged her and taken warrants out on her

10   for possession with intent to distribute marijuana.

11   Q.   Were there any firearms violation with her?

12   A.   No.  They -- well, no.  Robert Lucas was charged with a

13   firearm.  They charged him with possession of a firearm by a

14   convicted felon and also possession of marijuana with intent

15   to distribute.

16   Q.   Okay.

17   A.   They did not charge Ms. Williams with the firearm.

18   Q.   But she's been charged with possession with intent to

19   distribute?

20   A.   That's right.

21   Q.   And are there warrants -- was a warrant issued for her

22   arrest by Fulton County?

23   A.   Yes.

24   Q.   Okay.  Has -- when we -- before court you indicated that

25   to your knowledge there is no detainer on Ms. Williams; is

1   that correct?

2   A.   That's correct.

3   Q.   But the marshals are aware of the warrant?

4   A.   I believe so.

5   Q.   Okay.  Are you familiar with Ms. Williams' criminal

6   history category?

7   A.   I don't have that paperwork in front of me.

8   Q.   Okay.  Well, if I were to tell you that looking at

9   the -- the presentence report indicates it's a one.

10   A.   Okay.

11   Q.   Is that correct, as far as what you know?

12   A.   Yes.

13   Q.   Okay.

14          MS. ROEMER:  Thank you.

15          THE COURT:  Just one question, Ms. Roemer.  There

16   was no indication last week that we have a hearing date with

17   Judge Story.  Is that still the case?

18          MS. ROEMER:  We have a hearing date now, September

19   10th at -- what time is it?

20          THE WITNESS:  10:30.

21          THE COURT:  Okay.

22          MS. ROEMER:  Thank you.

23          THE COURT:  I'm sorry to interrupt.

24          All right.  Mr. Hawker?

25                              --   --   --

```
 1                    CROSS-EXAMINATION
 2  BY MR. HAWKER:
 3  Q.   So you have supervised her for five months roughly,
 4  Ms. Horton?
 5  A.   Roughly.
 6  Q.   And so for the first two years, she was supervised by
 7  others, roughly?
 8  A.   Roughly, yes.
 9  Q.   And notwithstanding some of these prior things brought
10  to the Court's attention, she's never been violated, anyway,
11  before?
12  A.   No, she's not.
13  Q.   In the five months you have supervised her, have you
14  ever visited the house where she lives with her mother,
15  Daphne Hayes?
16  A.   I have.
17  Q.   You have?
18  A.   Uh-huh.
19  Q.   So you are well aware then that she lives at 5597 Salem
20  Road, Lithonia?
21  A.   That's the address she reported to me, and I have seen
22  her there.
23  Q.   Sure, you have seen her there?
24  A.   Uh-huh.
25  Q.   And you have seen her ten-month-old baby daughter there
```

1   as well?

2   A.   I have.

3   Q.   Okay.  So you know she lives then with her mother

4   Daphne Hayes at that address with her ten-month-old baby?

5   A.   I know she submitted that as her residence, and I have

6   seen her there.

7   Q.   Did you confirm that she lived there with her mother?

8   A.   I have never seen her mother there.   I have seen her

9   siblings.

10   Q.   Okay.  Did you confirm it with them?

11   A.   Not as to the specific question does she live here,

12   no.

13   Q.   Did you walk throughout the house?

14   A.   I have.

15   Q.   Did you see that her things were there and the baby's

16   things were there?

17   A.   There are some things there.

18   Q.   Did you see that she had a bedroom there?

19   A.   She does.

20   Q.   Okay.  So there was evidence that she lived there and

21   spent the night there and stayed there?

22   A.   Yes.

23   Q.   And you had no reason to believe she didn't stay

24   there any night during the five months that you supervised

25   her?

1    A.    I did not.

2    Q.    Okay.  Now, let's go to the violations.

3          You indicated on direct that there was a letter sent to

4    the address we had.  What was the address?

5    A.    The address is 5597 Salem Road, Lithonia.

6    Q.    Okay.  You don't know if she received the letter?

7    A.    I can't say for sure.

8    Q.    Okay.  And you didn't talk to her prior to the hearing

9    on July 1st, 2013, about the hearing?

10   A.    No.  My attempts to call her were voice mails.  I left

11   her voice mails with the appointment time.

12   Q.    Sure.  And you don't know if she picked up those voice

13   mails?

14   A.    Not until Monday morning when she told me she got --

15   no.

16   Q.    Okay, let's talk about that, 7-1-13.  You indicated

17   that you talked to her that morning prior to the 2:00

18   hearing?

19   A.    No.  The hearing was at 10:00.

20   Q.    I see.

21   A.    I talked to her after the hearing when I attempted to

22   reach her when she hadn't shown up yet.

23   Q.    Okay.  Did she call you that day?

24   A.    She did.

25   Q.    Okay.

1    A.    She called back.

2    Q.    And so she called back in response to your voice mail to

3    her about the hearing?

4    A.    Yes.

5    Q.    And what did she tell you?

6    A.    She -- I said why aren't you here for your appointment.

7    She said she was at an employment interview.

8    Q.    Did she say, Oh, my gosh, I have an appointment?

9    I didn't know I had an appointment?

10   A.    She did not.

11   Q.    So there was no discussion about whether she knew she

12   had an appointment?

13   A.    She did not say.

14   Q.    Okay.  Nevertheless, she indicated that she was at a job

15   interview with a friend?

16   A.    I don't remember if she said with a friend, but she said

17   she was at a job interview, and she was driving.

18   Q.    Did you find out what interview she was at?

19   A.    No.  I was planning to ask her about it when she came in

20   later that day.

21   Q.    Okay.  Did she tell you it was McDonald's?

22   A.    She did not.

23   Q.    Okay.  And later that day did you talk to her about what

24   interview she was at and whether or not she had known of the

25   hearing in advance?

A.   No.  I had asked her what time she can make it to the
office by.  I said, Can you be here by 2:00?  She said
yes.  I said okay, and we'll -- I said I will talk to you
about it then, I think.  And she didn't show up or call
back.

Q.   And did you talk to her subsequent to then, to that
day?

A.   I haven't talked to her since that conversation.

Q.   Violation No. 2, failure to follow instructions.
January 3rd, 2013, instructed to turn herself in to
Rockdale County on an outstanding warrant for a traffic
violation.

     Was that the driving on a suspended license that you
referred to earlier?

A.   It was.

Q.   And that was the violation that she needed to report to
Rockdale on?

A.   Yes.  It's been discussed with her several times --

Q.   Okay.

A.   -- that she needed to take care of it.

Q.   With you and her?

A.   Yes.

Q.   Did you learn that the failure to appear for the initial
hearing was a result of her being in the hospital due to her
pregnancy?

1   A.   She mentioned that, but I still said you just need to

2   take care of it and to discuss your options with them.

3   Q.   Sure, sure.  But that was the reason she gave you for

4   not going to the initial Rockdale County hearing?

5   A.   I believe she did say that.

6   Q.   Okay.  And did you speak to her mother about that as

7   well?

8   A.   No.

9   Q.   Okay.  You have no reason to believe that she wasn't

10  being truthful with her about being in the hospital on the

11  day of that hearing?

12  A.   No, I have no proof to say either way.

13  Q.   Right.  You just wanted her to go clear it up and tell

14  Rockdale, hey, I was in the hospital?

15  A.   Right.

16  Q.   And for whatever reason, she hasn't done that?

17  A.   That's correct.

18  Q.   All right.  You explained the arrears on the electronic

19  monitoring.  That's for old E-monitoring?

20  A.   Correct.

21  Q.   Violation 3, failure to work regularly at a lawful

22  occupation.

23       And you had indicated that she had worked prior to your

24  supervision, but you didn't know what it was?

25  A.   I don't recall.  I wasn't supervising her.  And it's

1  information I can get, but I don't have it.

2  Q.   Okay.  So let's start from -- so we are really starting

3  from March 4th of 2013 --

4  A.   Uh-huh.

5  Q.   -- and your knowledge of her work from I guess January

6  7th, 2012; is that right?

7  A.   Can you repeat that?

8  Q.   Well, from January 7th, 2012, until you began to

9  supervise her March 4th, 2013, do you know if she worked?

10  A.   According to the notes from the previous officer, she

11  has not worked --

12  Q.   Okay.

13  A.   -- since that date.

14  Q.   Got it.  And you hadn't given her -- you are not aware

15  of any other instructions for her to report her efforts to

16  seek employment?

17  A.   No, not to my knowledge.

18  Q.   So she very well could have been seeking employment as

19  she had actually referenced to you that day she failed to

20  show up?

21  A.   But we discussed employment where if she had any

22  opportunities, and she was just told over and over again she

23  needed to find employment.  But I don't recall any -- her

24  providing any employment information to me.

25  Q.   Okay.  And you hadn't asked for any employment

1    information?

2    A.   Not specifically.

3    Q.   Okay.  The fourth violation is failure to refrain from

4    unlawful use of a controlled substance.  And then five is

5    failing to report for drug screens.

6         And -- now, it looks like the failure -- there was a

7    failure to report on February 12th, 2013; right?

8    A.   That's correct.

9    Q.   And then it looks like she went the following day,

10   February 13th, 2013, for the test?

11   A.   Well, sometimes we schedule them back to back on this

12   Code-a-Phone system.

13   Q.   Do you know if that was the case?

14   A.   I can't say for sure if it's from us contacting her for

15   missing or whether it was just scheduled the next day or

16   whether she just knew she missed one and came the next

17   day.  I can't say for sure.

18   Q.   Okay.  It could have been that she knew she missed and

19   needed to go in?

20   A.   It could have been.

21   Q.   You didn't talk to her about the miss on the 12th?

22   A.   I was not supervising her at that time.

23   Q.   Do you know if Ms. High talked to her about the miss on

24   the 12th?

25   A.   I don't recall.

1    Q.    Okay.  And there were two positives, one February 13th,

2    '13, for marijuana and one March 13th, '13, for marijuana.

3    Do you know if the micrograms from the February to the March

4    went down?

5    A.    We do not.  The lab just confirmed a positive on that.

6    So I don't have any specific levels.

7    Q.    Okay.  So you are not sure when the use occurred, how it

8    occurred, or any of the circumstances surrounding marijuana

9    use by her that relates to those dirties?

10   A.    That's correct.

11   Q.    And you haven't -- those are the first two days since

12   the January it looks like 2013 --

13   A.    Uh-huh.

14   Q.    -- dirty for marijuana, January 29th; is that right?

15   A.    Yes, January 29th.

16   Q.    Do you know the circumstances surrounding that dirty,

17   what was discussed with Ms. High?

18   A.    I do not.

19   Q.    Okay.  For example, you don't know whether the dirty

20   occurred as a result of it being secondhand smoke from this

21   Lucas character?

22   A.    I'm not sure.

23   Q.    Okay.  You are aware of that occurring, though, the

24   possibility that that could occur?

25   A.    I'm not aware.

Q.    Okay.  No methamphetamine was found at that apartment;

correct?

A.    That's correct.

Q.    And you have never seen her with any methamphetamine;

correct?

A.    I have not.

Q.    And there are false positives for meth use sometimes

if people are on cold medicine.  You are aware of that;

correct?

A.    Not when we get it back from the lab, I'm not aware of

that.

Q.    All right.  But you are not aware of her ever having

tested positive for methamphetamine; correct?

A.    That's true.

Q.    Or ever using methamphetamine; correct?

A.    Not that I know of.

Q.    And there is nothing in the presentencing report that

would indicate she ever used meth or tried meth or was around

meth?

A.    There is not.

Q.    Okay.  The circumstances -- you went into these misses

of drug testing in the past and the three times she missed

currently under this violation report.

        The drug testing occurs at Lavista Road here in Atlanta;

correct?

1   A.   At the Tucker -- our Tucker office she reports for drug

2   testing.

3   Q.   At Tucker?

4   A.   Yes.

5   Q.   Okay.

6        THE COURT:  You have to speak up, Ms. Horton, for

7   the tape.

8   A.   At the Tucker office she reports for her drug screens

9   primarily, unless she's coming to see us and we do them in

10  our office.

11  Q.   Here at the federal building?

12  A.   Uh-huh.

13  Q.   And she lives in Lithonia?

14  A.   She does.

15  Q.   So that's 30 to 45 minutes from Lithonia to go report

16  for the drug testing; correct?

17  A.   I'm not sure how far away it is.  Maybe thirty minutes.

18  Q.   Okay.  She doesn't have a car; correct?

19  A.   Not that she's told me.

20  Q.   All right.  Well, we know she doesn't have a license

21  now?

22  A.   She has --

23  Q.   It's suspended we should say.

24  A.   Well, she actually had showed me a new license she

25  got --

1  Q.   Okay.

2  A.   -- reinstated in I believe the end of February.

3  Q.   Oh, so --

4  A.   I don't know how, but --

5  Q.   -- she should be able to clear that up with Rockdale

6  County police?

7  A.   I think she -- uh-huh.

8  Q.   And so -- she doesn't have a car, though?

9  A.   Not that she's reported to me.

10 Q.   Okay.  And she has a ten-month-old baby that she takes

11 care of?

12 A.   That's correct.

13 Q.   And we know that the drug testing is in Tucker and she

14 lives in Lithonia.  Do you know how she gets to her various

15 appointments and obligations?

16 A.   I do not.  She does say she drives, because she's

17 indicated she's gotten traffic tickets.

18 Q.   Okay.

19 A.   So I don't know what cars she drives.

20 Q.   Okay.  When?  When was the last time she drove?

21 A.   I don't know.

22 Q.   Okay.  So you don't know whether that was a year

23 ago?

24 A.   I think she was driving on July 1st when she called

25 me.

1   Q.   Okay.  The circumstances of her arrest -- she did

2   finish, first of all, the moral reconation therapy?

3   A.   That's correct.

4   Q.   And the circumstances of the arrest, you indicated that

5   there was an apartment leased to her on November of

6   2012.  You indicated there is a fugitive task force that went

7   with Carlos Cosby to the residence?

8   A.   That's correct.

9   Q.   And she wasn't a fugitive?

10  A.   Well, there was -- our warrant was active.  They were

11  serving our warrant.

12  Q.   Had you made efforts to find her prior to the fugitive

13  task force being involved with a warrant?

14  A.   No.  I gave them the address in Lithonia.

15  Q.   Okay.  And do you know if they went to the address in

16  Lithonia?

17  A.   They did not, to my knowledge.

18  Q.   Okay.  So you knew where she lived or at least you

19  visited there and confirmed she had a room and clothes

20  there?

21  A.   Where is that?

22  Q.   At Lithonia.

23  A.   Yes.

24  Q.   And that's -- so on the day of her arrest, you knew that

25  she lived there?

1   A.   I had -- no, I was told by Carlos Cosby that a few days

2   before the arrest that he found the apartment.

3   Q.   Okay.  You don't know if he had ever gone up to

4   Lithonia?

5   A.   I don't think so.

6   Q.   Okay.  Did you talk to him about whether or not any of

7   her belongings were in the residence that was occupied by the

8   gentleman, Robert Lucas?

9   A.   I did.

10  Q.   Were any of her personal items there?

11  A.   He said he saw her clothes in a closet.

12  Q.   Okay.  Some clothes of hers or --

13  A.   A female's clothes in a closet.

14  Q.   A female's clothes.  We don't know whose they were

15  necessarily?

16  A.   I do not.

17  Q.   Okay.  And she wasn't charged with any guns; correct?

18  A.   They did not.

19  Q.   Those were found in the master bedroom?

20  A.   They were found on the floor of the master bedroom.

21  Q.   And she wasn't -- and she was charged, however, with the

22  marijuana; is that right?

23  A.   That's right.

24  Q.   And that was also found in the master bedroom, the

25  majority of it?

A.   No, they found that on the floor of the master bedroom
and both toilets in the apartment.

Q.   Okay.  But the two pounds that you are referring to was
found in the master, the floor of the master?

A.   No.  I believe it was taken from -- I read that to be
the whole amount.

Q.   You are not sure what amounts were found where?

A.   I'm not exactly, no.

Q.   Okay.  What clothes were found there of hers?

A.   I don't know specifically.  He said there was what he
said was her clothes in a closet.

Q.   Okay.  How many clothes?

A.   I don't know.

Q.   Anything else?  Toiletries, baby things, anything else
that would indicate that she --

A.   He did not indicate anything specific other than the
baby was there.

Q.   Okay.  And you don't know how long she may have been
present there that day?

A.   I do not.

Q.   Neither does Mr. Lucas or Mr. --

          THE COURT:  Can I ask a question?  What time of day
was this?

          THE WITNESS:  Approximately 7:30.

          THE COURT:  A.m., p.m.?

```
1                THE WITNESS:  A.m. -- let me look.

2                Yes, 7:30 a.m.

3                MR. HAWKER:  All right.  I don't think I have

4    anything else.  Let me ask my client, Judge.

5                Nothing further.

6                THE COURT:  Anything, Ms. Roemer?

7                MS. ROEMER:  Just a couple things.

8                         -- -- --

9                     REDIRECT EXAMINATION

10   BY MS. ROEMER:

11   Q.   Do you have the lease with you?

12   A.   I do.

13   Q.   Let me refer you to Paragraph 2 of the lease.  It

14   indicates that there is a second occupant of the residence,

15   someone by the name of Rheanna Lucas.  Do you know anyone

16   named Rheanna Lucas, R-h-e-a-n-n-a?

17   A.   I do not, unless it's her daughter.

18   Q.   But you don't --

19   A.   I'm not sure.

20   Q.   You don't know who that is?

21   A.   No.

22   Q.   Okay.  Are you planning to amend your petition?

23   A.   I am.

24   Q.   And what are you going to include in the amended

25   petition?
```

1   A.   The new criminal charge of possession with intent to

2   distribute marijuana, technical violation of changing her

3   residence without permission, technical violation of

4   possession of a firearm, and technical violation of

5   association with convicted felons.

6           MS. ROEMER:  Okay.  Thank you.

7           MR. HAWKER:  Judge, I forgot to ask two questions.

8                        -- -- --

9                    RECROSS-EXAMINATION

10  BY MR. HAWKER:

11  Q.   Do you know whether or not Ms. Williams knew that

12  Mr. Lucas was a felon?

13  A.   I do not.

14  Q.   And did you go to -- did anybody go to the leasing

15  office to find out who actually lived there on a day-to-day

16  basis or paid their rent?

17  A.   The Deputy U.S. Marshal Carlos Cosby did.  He indicated

18  when he visited there, that they said that Ms. Williams lived

19  there.   That's all the information I have.

20  Q.   From the lease that they got?

21  A.   I don't know any more information about it.  It was his

22  conversation with the leasing office.

23  Q.   Okay.

24          MR. HAWKER:  All right.  That's fine.

25          MS. ROEMER:  Nothing else.

1          THE COURT:  Ma'am, you may step down.

2          MS. ROEMER:  No other evidence from the

3     government.  Just argument at the appropriate time.

4          THE COURT:  Do you wish to make argument on the

5     violations, Mr. Hawker?

6          MR. HAWKER:  No, Judge.  We rest on the record.

7          THE COURT:  All right.  I find there is sufficient

8     probable cause on each of the violations.

9          You can go forward now on your bond.  Mr. Hawker,

10    it's your burden.

11         MR. HAWKER:  I will call Daphne Hayes.

12         (The oath is given by the Courtroom Deputy Clerk.)

13         THE CLERK:  You may be seated.

14         THE COURT:  State your full name for the record and

15    please spell your last name?

16         THE WITNESS:  Daphne Lynn Hayes, H-a-y-e-s.

17         THE COURT:  Thank you.

18                    --  --  --

19                    DAPHNE LYNN HAYES

20       being first duly sworn by the Courtroom Deputy Clerk,

21                 testifies and says as follows:

22                    --  --  --

23                    DIRECT EXAMINATION

24    BY MR. HAWKER:

25    Q.   Ms. Hayes, could you explain to the Court your

1    relationship to Ms. Williams?

2    A.   She's my daughter.

3    Q.   And where do you live?

4    A.   5597 Salem Road, Lithonia, Georgia   30038.

5    Q.   And how long have you lived at that residence?

6    A.   Nine years and some odd months.

7    Q.   Who do you live there with?

8    A.   Myself, my husband, my 15-year-old son, my

9    granddaughter, and my daughter.

10   Q.   By daughter, you mean?

11   A.   Yasmeen.

12   Q.   Yasmeen Williams?

13   A.   Yes.

14   Q.   And her baby daughter.  And what is her baby's name?

15   A.   Rheanna.

16   Q.   Rheanna?

17   A.   Yes.

18   Q.   And who is this fellow, Robert Lucas?

19   A.   A guy that's in and out of her life, sometimes on,

20   sometimes off, and the father of her daughter.

21   Q.   Okay.  So he's the father of her ten-month-old child?

22   A.   Yes.

23   Q.   Did you know he was a felon?

24   A.   I absolutely did not.

25   Q.   Okay.  Do you know if Yasmeen knew?

```
 1    A.   I don't know.
 2              THE COURT:  Now, Mr. Hawker --
 3              MR. HAWKER:  She might have mentioned it, there may
 4    have been discussions about it.
 5              THE WITNESS:  Well, I mean, I'm in her --
 6              THE COURT:  If she did know?
 7              MR. HAWKER:  Yes.
 8              THE WITNESS:  Well, I'm -- I mean, I'm the type
 9    of mother that I'm very involved and I'm concerned about
10    who she keeps company with, so I ask a lot of questions.
11    And I didn't know, no.
12    BY MR. HAWKER:
13    Q.   So your husband, Mr. -- what's your husband's name?
14    A.   James Edward Hayes.
15    Q.   Where does he -- what does he do for a living?
16    A.   He works at Federal Express as a sorter.
17    Q.   Uh-huh.
18    A.   And he also works for J. C. Penney's warehouse as a
19    sorter but in a warehouse setting.
20    Q.   How long has he worked at those jobs?
21    A.   A few years for each, but he worked for Federal Express
22    previously for six years and was laid off and so later
23    returned.
24    Q.   What do you do for a living?
25    A.   I'm a set decorator for the television/film industry.
```

1    Q.    How long have you done that?

2    A.    Ten years.

3    Q.    Do you work for a company?  I understand you are with a

4    union.  What union are you with?

5    A.    I'm with IATSE Local 479.  And forgive me for the

6    acronyms.  It's the International Art and Entertainment

7    Studio --

8    Q.    We actually talked about it before.  International

9    Alliance of Theatrical Stage Employees?

10   A.    Yeah.

11   Q.    It's all right.

12   A.    It doesn't mean anything to me, but that is it.

13   Q.    That's fine.  So you have worked at that job for the

14   last ten years?

15   A.    Yes.

16   Q.    And what education do you have?

17   A.    I have an Associate's in Business and a Bachelor's in

18   Interior Design.

19   Q.    From what schools?

20   A.    Darton College in Albany, Georgia, and Bauder College in

21   Atlanta, Georgia, respectively.

22   Q.    Okay.  And where did you live before you lived at the

23   5597 Salem Road address?

24   A.    6161 Dana Court, Lithonia, Georgia  30058.

25   Q.    How long did you live there?

```
 1   A.    Eighteen years.

 2   Q.    How long have you been married?

 3   A.    To my current husband, seventeen years, and Yasmeen's

 4   father, I was married to him ten years.  So --

 5   Q.    Where did you work before you worked in the theatrical

 6   union?

 7   A.    I worked for fifteen years for the U.S. Department of

 8   Commerce, the United States Census Bureau.

 9   Q.    What did you do there?

10   A.    I was a senior field representative.

11   Q.    Where?

12   A.    Atlanta.  Well, our region covered Alabama, Kentucky,

13   Florida and Atlanta, but the main office is here in Atlanta.

14   And so I worked from the main office.

15   Q.    How long have you lived in Atlanta?

16   A.    Thirty years or so, more.

17   Q.    What other family do you have here in Atlanta?

18   A.    My mother is here.

19         My father moved here after he retired, so he was

20   here.  He actually lived with me for ten years.  He just --

21   actually just got an apartment at a senior citizens

22   building.

23         And my grandmother lives here.  When my grandfather

24   passed away, she moved here also.

25         So I'm kind of the caretaker of the entire family.
```

1   Q.   And you have how many kids?

2   A.   Four.

3   Q.   You mentioned your son that lives with you, your

4   daughter Yasmeen.

5        Foria Pittman is also your daughter?

6   A.   Foria Pittman, yes.

7   Q.   She has her own apartment?

8   A.   Yes.

9   Q.   And then you have another child?

10  A.   Yes.  Monia Pittman.

11  Q.   Okay.  And do you have how many grandkids?

12  A.   Five.

13  Q.   Okay.

14  A.   Five.

15  Q.   You indicated that you were sort of the caretaker for

16  the family?

17  A.   Yes.

18  Q.   Have you been the caretaker for Yasmeen?

19  A.   Absolutely, yes.

20  Q.   And you heard the probation officer testify about her

21  starting her probation or supervision May 31st, 2011?

22  A.   Yes.

23  Q.   Now, when she got out, did she live with you?

24  A.   Yes.

25  Q.   And has she lived with you since May 31st, 2011?

1    A.    Yes.

2    Q.    Where?

3    A.    At 5597 Salem Road, Lithonia, Georgia  30038.

4          She's been there the entire lot.  Sometimes she spent

5    the night out, which wasn't often, but she lives at my

6    house.

7    Q.    Okay.

8    A.    And -- well, I guess there's no need for details.

9    Q.    That's fine.  I will ask you some more about that since

10   it's an issue.

11         Did she live at your house up to and including August

12   1st?

13   A.    Yes.

14   Q.    Okay.

15   A.    I actually have text messages where it shows on my phone

16   where she didn't even have a key or whatever to that

17   apartment.  She would have to wait in the parking lot to

18   get -- to drop like his family off.

19         Because Robert Lucas has other children that visited

20   with us often.

21   Q.    Uh-huh.

22   A.    And when she would have to take them back to him, she

23   couldn't even get in.  She would have to wait outside.

24         So -- and I have a text message where I'm saying, you

25   know, this is unfair that you have to wait in the parking lot

1    to give him his children and blah, blah, blah, blah.

2        So I don't know if it's much evidence, but --

3    Q.   Sorry.  Are you aware of this apartment that was leased

4    in her name, 49 Boulevard Avenue?

5    A.   I didn't know it was in her name.

6    Q.   Right.

7    A.   But I will say, like I said, she did not live there.

8    She lived with me.  She was home.  She lived with me.  So

9    I don't know the circumstances of it being in her name and

10   why or any of that.

11   Q.   Sure.  Now, the baby?

12   A.   Uh-huh.

13   Q.   Did the baby live with you?

14   A.   Yes.

15   Q.   Did the baby ever live with Robert Lucas?

16   A.   Never.

17   Q.   Okay.  Or stay there the night?

18   A.   Without her?

19   Q.   Without her.

20   A.   Oh, no, no, no, no.

21   Q.   Perhaps with her, but not very often at all?

22   A.   Never.  I mean, I remember -- when I say that they are

23   on again, off again, there were times -- as far as addressing

24   female's clothes being at that house, he had another

25   girlfriend.

1           And he wasn't always her boyfriend, but she still

2    maintained a relationship with him with the baby.

3           And the other kids loved her, his other kids.

4    Q.    Uh-huh.

5    A.    And there were times that they would beg her to bring

6    their sister, half-sister down to be with them, and she would

7    go and take the baby to see the other kids and to see him and

8    leave.  And it was clear that they weren't together; that she

9    was only going to take the baby to see them.

10          And she did that often.  I mean, I remember her

11   spending the night, and I was saying, you know, if you all

12   aren't together, why are you spending the night down there,

13   and she said the kids begged her to stay.  She didn't sleep

14   in the room with him.  You know, it was totally for the

15   baby.

16          So I don't know if they were on again that day, but

17   I do know that she would take the baby to see him, and she

18   was still close with his other children, because they love

19   her.

20          I mean, they love me.  They call me grandma, his other

21   kids.

22   Q.    You don't know him very well, though?

23   A.    No, I don't.

24   Q.    What efforts are you aware of for her to find work?

25   A.    She has been looking for work quite often.

```
 1        I mean, as a matter of fact, Walmart called yesterday
 2   because she had two interviews with them, and they actually
 3   called to offer her a job yesterday.  And she had --
 4   Q.   Did you speak with them?
 5   A.   Yes, I answered the phone.  They called my phone.
 6   Q.   And they offered her a job?
 7   A.   Well, when I answered the phone and I said that she
 8   wasn't available and I asked who it was or whatever, and the
 9   young lady gave me her name and she said it was regarding a
10   job offer.
11        But she was expecting them to call, so she was waiting
12   for them to call.  And her phone was broken; that's why she
13   gave them my number.
14        And before that, she was going through an orientation
15   for McDonald's.  And she was constantly going out looking for
16   a job.
17        And I, quite frankly, always told her that it didn't
18   make any sense getting a seven-dollar-an-hour job, because
19   that wasn't going to change her life.  That she needed to go
20   to school; that was the only thing that was going to change
21   her life.
22        And working seven dollars an hour, being away from the
23   baby and spending ten hours raising the baby in this day
24   care, it just didn't make any sense to me.
25        When I worked for the Census Bureau, I took that job
```

```
1    solely because I could work from home and I could be there
2    for my children.  I took my kids to school, I was home when
3    they got home from school, and that was important to me.  So
4    it was important for her also, in my eyes.
5         And I do it for all my grandkids.
6    Q.   So she was raising the baby?
7    A.   Yes.
8    Q.   You weren't raising the baby?
9    A.   Oh, yes.  She does -- yeah.  I'm there as support, but
10   that's her baby.  I'm not trying to raise -- I raised my
11   kids.
12   Q.   You are working?
13   A.   Yes.  And I work 12 hours, 13 hours a day.
14        And some of this with the missed appointments and
15   whatever was -- it was like I'm also doing this time with
16   her, because she doesn't have a car, she has the baby.
17   So if I'm -- if she has to be somewhere at 6:00, I have to
18   arrange for somebody to take her or I have to get off of
19   work, come take her.
20        There were times when she went to the probation office
21   and I'm sitting in the parking lot with the baby in the car
22   while she goes in, does whatever.
23        The class that she has downtown, I sit outside -- and it
24   was not daylight savings time.  I would sit outside, me and
25   the baby, downtown Atlanta, across from some park with
```

1    vagrants and homeless people or whatever, waiting for her to

2    go on into this class.

3         Sometimes she was on -- I mean, I personally witnessed

4    she was on time.  She was there ten minutes before she was

5    supposed to be there, and she goes inside, and the young lady

6    who ran the class wouldn't let her in.  And so I'm like this

7    doesn't make sense.

8         Even the security guard at the door was like, well, you

9    have time, you know.  We're looking at the clock.  So I go in

10   and the lady says --

11             THE COURT:  Ms. Hawker, can we --

12             THE WITNESS:  I know, I'm going on and on.

13             THE COURT:  Can we focus?

14             MR. HAWKER:  Yeah, we will --

15             THE COURT:  Just answer a question.

16             MR. HAWKER:  Yeah, I appreciate that.

17             THE WITNESS:  But, yeah, so I mean --

18   BY MR. HAWKER:

19   Q.   Let me ask you a question.

20   A.   Okay.

21   Q.   Did she apply to college?

22   A.   Yes, she did.

23   Q.   Where?

24   A.   Georgia Perimeter College.

25   Q.   Okay.  And you have given me some correspondence

1   indicating she applied to Perimeter --

2   A.   Some --

3   Q.   Let me ask the question.

4        -- that says she had applied to college there; correct?

5   A.   Yes.

6   Q.   All right.  So you have documentation of her having

7   applied?

8   A.   Yes.

9   Q.   And she intended to go to college at Georgia Perimeter?

10  A.   Yes.

11  Q.   Last line of questioning.  Would you -- do you have

12  money and property to post as security for bond?

13  A.   Yes.

14  Q.   Do you have property to post?

15  A.   Yes.

16  Q.   What's the address of the property that you are willing

17  to post for your daughter to get bond in the case?

18  A.   5814 Windermere Court, Lithonia, Georgia  30038.

19  Q.   What's the value in your estimation of the property?

20  A.   Between seventy and eighty thousand dollars.

21  Q.   Do you own the property outright?

22  A.   Yes.

23  Q.   You don't have documentation here with you today?

24  A.   No, but my --

25  Q.   Is it in your name or your husband's name?

A.    My husband's name.

Q.    And would he be willing to post the property for bond in the case?

A.    Yes.

Q.    Would you be willing to co-sign a bond?

A.    Yes.

Q.    Would you be willing to have her live at your house on bond?

A.    Yes.

Q.    Even if it meant that she had a curfew or strict home confinement conditions prior to the final hearing?

A.    Yes.

Q.    And would you make sure that she was able to get to all of her future hearings in the case by either driving her or making sure that she was aware of any notices that came and stay on top of helping her with that?

A.    Yes.

          MR. HAWKER:  Thank you, Judge.  Nothing further.

          THE COURT:  Ms. Roemer, any cross?

          MS. ROEMER:  Just very quickly, Your Honor.

                    --  --  --

               CROSS-EXAMINATION

BY MS. ROEMER:

Q.    Ms. Hayes, had you -- you were aware of this apartment on Boulevard?

1    A.   I knew that's where her boyfriend lived.

2    Q.   But you had not ever been there yourself?

3    A.   I went -- I went before down there with her a couple of

4    times, but I have never been in the apartment, except one

5    time when, the Saturday before the arrest, his mother was

6    getting married, and I was taking the baby and her there

7    because she was going to the wedding with him.

8         And he asked me could I come and help him tie a tie,

9    because he didn't know how to tie a tie.  And that was the

10   first time I ever went inside the apartment.

11   Q.   You went inside --

12   A.   Once.

13   Q.   -- but you didn't search the apartment; correct?

14   A.   No, no, no, no.

15   Q.   As to what female's clothing was there, you never -- you

16   didn't --

17   A.   No, I didn't walk around or anything.

18   Q.   Okay.

19             MS. ROEMER:  Nothing else.

20                       -- -- --

21                  REDIRECT EXAMINATION

22   BY MR. HAWKER:

23   Q.   Never saw any drugs, guns, ammunition?

24   A.   Nothing, no.

25   Q.   Did you ever see your daughter with any of those

1 things?

2 A. No, no, no, no.  I don't condone illegal activity.

3    THE COURT:  You may step down, ma'am.  Thank you.

4    Any other witnesses, Mr. Hawker?

5    MR. HAWKER:  No, that's all, Your Honor.

6    THE COURT:  Ms. Roemer, do you have anything

7 besides what you presented for probable cause?

8    MS. ROEMER:  No, Your Honor.

9    THE COURT:  All right.  Mr. Hawker?

10    MR. HAWKER:  She has a supportive family, all of --

11 many of whom are here.  Her stepfather is not.  He's probably

12 working.

13    Her mother obviously testified, and has roots in

14 Atlanta for thirty some odd years, employed, respectable,

15 productive, law-abiding citizen, as are all her children,

16 with the one exception of Ms. Williams who had a problem

17 with an uttering of counterfeit currency and the people she

18 was with to the tune of a total of $90 of loss in

19 restitution, which has been paid; a time-served sentence of

20 92 days, all pretrial, imposed in the Middle District; and

21 three, not five years, of supervised release on a 20-year

22 Class C felony.

23    So that's improper -- that's incorrect actually on

24 the front page of the petition.  The judgment reflected three

25 years of supervision.

1    Her range for revocation under the current

2   petition -- the amendments may come, they may not, but

3   apparently they are going to amend -- is for a Class -- or

4   Category 1, zero criminal history points other than uttering

5   some counterfeit currency at a Dollar General Store, no

6   criminal history prior to that, is three months at the low

7   end to eight or nine months at the high end.

8    She does have outstanding warrants.  The one

9   warrant that was outstanding in Rockdale was driving on a

10   suspended license.

11    I should have asked her mother if she was in the

12   hospital.  She would say she was.  We are prepared to show

13   that at a final hearing.  I can proffer that fact.

14    THE COURT:  Well, that's not the violation.

15    MR. HAWKER:  Right.  But --

16    THE COURT:  The violation is not taking care of it.

17    MR. HAWKER:  Sure, not taking care of it.  But

18   I didn't want the Court to think that she was failing to

19   appear for a court date on that day for something less than

20   being in the hospital when she potentially could have cleared

21   it up with them even going back in.

22    What I understand is she was told that you are

23   going to get ten days in custody before you go to court, and

24   she was afraid and she didn't go down to report it, turn

25   herself in.

1        She should have, and she could have clarified it

2   probably with them.  Even having done that, she would have

3   spent ten days in jail, and she has a new baby.

4        It's wrong.  She should have done it.  Her mom

5   agrees with that.  We have spoken about it.  And hopefully

6   she will be able to clear it up with Rockdale and get a bond

7   there on something as minor as that.

8        The Fulton County, Mr. Lucas is already out on

9   bond.  I wouldn't want her in state custody, obviously.

10  I would like to resolve this beforehand and get it done.

11  I think she would bond out there.  But I'm sure they would

12  call and she would go over there.

13       So that was a concern until I heard Mr. Lucas had

14  been bonded out on the charges.  I mean, the apartment was in

15  her name.  It appears from a document I received -- not in

16  evidence, but I'm not contesting that fact at this point --

17  it looks like she rented it for the guy.

18       I don't know when and what terms they were on then,

19  but her mother testified that they are just on and off.  He's

20  the father of the baby, so it's hard not to associate with

21  him.  And I'm not sure there is any evidence she knew he was

22  felon.

23       She's not charged with the guns, never had a gun,

24  the underlying offense is not gun.

25       She's had some positives for marijuana.  Never had

1    any on her person found.  Under the underlying case there was

2    some in the car, but two positives on the violation report,

3    one the day after she missed and went in.  I don't know if it

4    was voluntarily or if she just got called back to back.

5          No indication that she's ever been around meth.

6    I think we are going to have to explore that, as well as the

7    micrograms on the marijuana.

8          And I have a suspicion that positives

9    potentially -- I don't know about back a year ago or two

10   years ago -- may be from being around this gentleman.  Not

11   that that's a mitigator of any kind if he was using and she

12   was there.   But nevertheless that doesn't make her a danger,

13   certainly doesn't make her a flight risk.

14         I know it has to reasonably assure her appearance

15   at future proceedings, and there have been a lot of missed

16   things, and that's got to be a concern.  You know, you miss

17   the administrative hearing.

18         She called, she talked to her and said she was

19   on -- that she should have made the administrative hearing,

20   if she knew about it.  My indication is that she wasn't

21   aware --

22         THE COURT:  The concern is she was supposed to be

23   there at two that afternoon.

24         MR. HAWKER:  Not to my knowledge, no.

25         THE COURT:  Yes, she was.  She talked to

1    Ms. Horton.  Ms. Horton testified that she called --

2                MR. HAWKER:  After?

3                THE COURT:  -- that morning --

4                MR. HAWKER:  Or that morning?  Oh, that morning,

5    okay.

6                THE COURT:  Yes.  When she called --

7                MR. HAWKER:  That day, that day, okay.

8                THE COURT:  She called that morning, she confirmed

9    she could be there at two, and she just didn't show.

10               MR. HAWKER:  Okay, prior to that day I don't know

11   what she got.  That was my --

12               THE COURT:  She got notices sent to where she

13   supposedly was living.

14               MR. HAWKER:  Correct, correct.

15               THE COURT:  And that's all Ms. Horton is required

16   to do.

17               MR. HAWKER:  No, I'm not contesting that.

18   I misunderstood, and I think it was just the fact that that

19   day was, to my knowledge, the first actual notice that we

20   know of.  So -- and she was, according to her report, out

21   looking for a job then.

22               She should have made the administrative hearing,

23   but, you know, wasn't in the wind, living at her mother's

24   house.  I don't know why it became a fugitive task force

25   thing.

```
 1              THE COURT:  I think, Mr. Hawker, you are making
 2    more out of the title.  I think it's just who the marshals
 3    use to execute warrants.
 4              MR. HAWKER:  Okay.
 5              THE COURT:  So don't make a big deal out of the
 6    title of the group.  It's just a group of deputies.
 7              MR. HAWKER:  Well, I understand, Judge.
 8              THE COURT:  Okay.  So don't make a big deal out of
 9    the title.  I didn't make a big deal out of the title.
10              MR. HAWKER:  Okay.  Well, I just didn't want anyone
11    to, though.
12              THE COURT:  No, I know what the group is.
13              MR. HAWKER:  But I suspect, you know, that
14    she's been -- she has been living with her mother, as she
15    testified to, and her belongings are there and her daughter
16    is there.
17              And she has a ten-month-old daughter, and that's
18    one of the main reasons that I'm asking for the Court to
19    consider her for bond notwithstanding some of these prior
20    missteps and failures to meet her obligations.
21              I don't think any of those, together or
22    individually, mean that she won't make a future hearing or
23    that she somehow is a danger.
24              And I think that's the point I wanted to focus on
25    is that she's not -- she's not a runner, a malicious person
```

1    who is not going to try to show up, certainly not at this

2    point with the violation petition and two warrants from

3    different counties.

4            And so I would ask the Court to consider that

5    together with her mother's testimony, to grant some

6    conditions of release that would satisfy the Court.

7            Thank you.

8            THE COURT:  Okay.  Ms. Roemer?

9            MS. ROEMER:  Thank you.

10           Your Honor, Ms. Williams has not met her burden.

11           She is a danger.  She was arrested.  They had to

12   breach the door to get in.  There were loaded handguns, there

13   was two pounds of marijuana, including marijuana on the

14   living room floor.

15           She's hanging out with a convicted felon.  Whether

16   or not we can prove that she knew Mr. Lucas was a convicted

17   felon, we will address that at the hearing in front of

18   Judge Story.  But those factors right there on the date of

19   the arrest makes her a danger.

20           Flight risk, I mean, repeated failures to show up

21   when she's supposed to show up where she is supposed to show

22   up.  Misses an administrative hearing.  The date of the

23   hearing she said she will be there, she's not.

24           And I will refer the Court to the presentence

25   report, which I think you have.

1           THE COURT:  I don't.

2           MS. ROEMER:  Well, let me -- well, counsel -- both

3   counsel provided it.

4           Paragraphs 7 and 8 indicate the number of --

5   or Ms. Williams' failure to comply with conditions of

6   pretrial release.  Her pretrial -- there are two

7   paragraphs on it.

8           I won't go into every bit of it, but ultimately

9   she had to appear before a magistrate judge.  Her pretrial

10  release was revoked, and that's why she ended up getting a

11  time-served sentence probably.  She had to go into custody

12  because she couldn't -- she was not complying with the

13  terms of the pretrial release.  Paragraphs 7 and 8 go into

14  the details on that, but that's the summary of what

15  happened.

16          We have got the three violation reports submitted

17  to the Middle District of Georgia.  This is an individual who

18  has failed in many respects, and it's actually in some

19  respects surprising that there hasn't been a petition

20  presented to the Court before now.

21          But in any event, the final hearing is September

22  10th.  We ask for her detention until then.

23          THE COURT:  I'm not as concerned about flight, but

24  there is one thing clear to me:  She can't abide by

25  conditions.  And I don't know what conditions I could set

1    that would make her start abiding by bond, conditions of
2    release.
3              And if for no other reason, she's a danger.  I
4    don't care how long she was in that apartment.  I think --
5    were there other children in the apartment that morning or
6    just the baby?
7              MS. ROEMER:  No, Your Honor.
8              THE COURT:  So if she was over there because his
9    kids wanted her to stay, they weren't there that night.
10              She had that child, her child that she cared so
11   much about, in that apartment with the drugs and the gun.
12   She's a danger not only to herself, but to her child.
13              And she's misled the probation officer, and I just
14   don't think she's entitled to a bond or she's established
15   that she's not a danger.
16              So I will order her to be held without bond pending
17   a final hearing.
18              THE CLERK:  All rise.  The court is in recess.
19                   (Proceedings adjourn at 11:13 a.m.)
20
21
22
23
24
25

1                        C E R T I F I C A T E

2

3     UNITED STATES OF AMERICA        :
                                       :
4     NORTHERN DISTRICT OF GEORGIA    :

5

6              I, Nicholas A. Marrone, RMR, CRR, Official Court

      Reporter of the United States District Court for the Northern

7     District of Georgia, do hereby certify to the best of my

8     ability that the foregoing 63 pages constitute a true

9     transcript of audio-recorded proceedings had before the said

10    Court, held in the city of Atlanta, Georgia, in the matter

11    therein stated.

12             In testimony whereof, I hereunto set my hand on

13    this, the 16th day of August, 2013.

14

15

16

17                        /s/ Nicholas A. Marrone

18             _____
                          NICHOLAS A. MARRONE, RMR, CRR
19                        Registered Merit Reporter
                          Certified Realtime Reporter
20                        Official Court Reporter
                          Northern District of Georgia

21

22

23

24

25